Joseph Manuel VIDAURI, Respondent,

v.

STATE of Missouri, Appellant.

No. 57797.

Supreme Court of Missouri,
Division No. 1.

Nov. 12, 1974.

Forriss D. Elliott By Richard A. Fredman, St. Louis, Gary R. Sarachan, Law Student (Eligible pursuant to Missouri Supreme Court Rule 13), for respondent.

John C. Danforth, Atty. Gen., Stephen D. Hoyne, Asst. Atty. Gen., Jefferson City, for appellant.

SEILER, Judge.

Appeal by state from judgment granting relief to movant in proceeding under rule 27.26, V.A.M.R. We affirm.

Joseph Manuel Vidauri was charged by indictment in Cole County, Missouri, with murder of another inmate of the Missouri State Penitentiary, William Lee Donnell, in the riot at that institution on September 22, 1954. Six other prisoners were jointly indicted with defendant. On change of venue to St. Charles County after a severance, Vidauri was tried to a jury and found guilty and sentenced to life imprisonment. On appeal to this court, the conviction was affirmed. State v. Vidauri, 293 S.W.2d 955 (Mo.1956).

In 1968, Vidauri filed a motion under rule 27.26 in the St. Charles County Circuit court. One of the grounds was a denial of due process in using against him an alleged involuntary confession. It was on this ground that the trial court granted relief.[1]

As said, the death of Donnell occurred during a prison riot on September 22, 1954. There was a second and less violent riot one month later. Capt. (then Lt.) Barton of the highway patrol was in charge of

1. On two occasions, the trial court was ready to rule on the motion, but withheld action on movant's request. For this reason, the motion was not ruled until March 3, 1972.

one of the investigating teams and early in the investigation other inmates had implicated a prisoner known as "Jap Joe" as one of those who forced their way into Donnell's cell and killed him. Barton testified at the original trial that he learned within the first five to ten days that Jap Joe was Vidauri, but at the 27.26 hearing he testified he did not obtain the information about the identity of Jap Joe until after October 22. Vidauri was not questioned until October 26, although the officers obtained signed confessions within the first two weeks from each of the other six inmates charged.

■ Bearing in mind that the court hearing the 27.26 motion is not confined to the earlier record, we endeavor to reduce the mass of testimony produced at the original trial, both out of and then in the presence of the jury (the entire transcript of the original trial was admitted in evidence at the 27.26 hearing), and the testimony produced at the 27.26 hearing, as follows:

Vidauri testified that he entered the penitentiary in February, 1952, age about 17, on a five year manslaughter sentence from Jackson County and at the time of the riot had, with good time credit, approximately six months yet to serve. He was of Mexican origin, with an eighth grade education. A large part of his growing up had been in various orphanages. At his trial and at the 27.26 hearing Vidauri maintained that he was coerced into signing a false confession, that he did not participate in any way in the Donnell slaying, and that he was elsewhere in the prison when it occurred.

On October 26, he was taken from his cell to the Classification room, in which there were ten to twelve troopers with rifles and shotguns. Barton was armed with a pistol. Nothing was said to Vidauri as to his right to remain silent or to have counsel, or that what he said would be used against him. Vidauri feigned inability to speak more than broken English, believing "if I did speak English that they would try to force me to write a confession out . . . I didn't know anything. But it isn't a matter of whether you wanted to. It is a matter of what they demand you do."

From the Classification room, Vidauri was taken downstairs to the Bertillon room, where there was a typewriter. (Barton testified that the confessions from the other defendants were in their own handwriting but Vidauri's was typed).

Vidauri testified that the interrogation lasted approximately six hours and that the confession was drawn up in the following manner:

"When he asked me a question which wasn't so, for example: 'You went down to B basement, didn't you' and I would tell him 'No'—I would tell him 'No, I didn't go down there'—he would say, 'What do you mean you don't know?' He would ask me, 'What do you mean "No".'

"I said, 'No, I didn't go down there.'

". . .

"Well, when Lieutenant Barton asked me the question: 'You went down in B basement' and I told him 'No', he said, 'What do you mean "No"', and I turned around and saw the one with the mustache—he pointed a long gun at me and to keep the officer from getting mad I said, 'I don't know.'

"He said, 'What do you mean you don't know?' He said, 'You went down in B basement, didn't you?'

"I knew if I said 'No' that I had no chance. They told me that all they wanted was the truth and nothing but the truth. I am supposed to say 'yes', which is music to their ears—nothing but that. If I say 'No', they say 'You are lying.'

"If I say, 'I don't know,' they say, 'You are trying to hide something.'

"He said, 'You went down in B and C basement?'

"The first time I said 'No'. The second time I said 'No', I shrugged my shoulders.

"He said, 'You did go, didn't you?' I said—I was really afraid to answer. All he wanted me to say was 'Yes, I did go.'

"So I said—he started to type that down. It was the same all the way down on the statement . . ."

Sgt. Nash was typing what Lt. Barton was suggesting to Vidauri and then they wanted him to sign it. Vidauri told them he could not read English, so Barton read it to him, but Vidauri denied it was what he had said and refused to sign it. Barton told him he "had better wise up. You are nothing but a convict in the penitentiary . . . You are just a spick and if we shoot you, who is going to question us? We are troopers. All we have to say is that you partook in the riot and no questions will be asked . . . we have orders from the Governor to shoot to kill and therefore if we shoot you who is going to ask us any questions. You better . . . go ahead and sign this thing here and then you can live a little longer or else get shot now." Vidauri still refused, whereupon Sgt. Nash told him to remember what Barton had said about orders to shoot to kill. Vidauri was aware that six convicts had been killed and over 30 wounded, and "figured they were going to shoot me too, so the only way out, I figured, was, I thought to myself, I will sign this thing with my left hand now and I will have a chance later on to show . . . that this thing here, this left-handed signature, is by force . . . so I went ahead and signed it with by left hand."[2]

Vidauri testified that during the questioning in the Classification room he was hit on the ear, and when in the Bertillon room he was struck a dozen times, in the kidneys, stomach, and shins and jerked out of his chair.

Lt. Barton's testimony was that the questioning took a couple of hours or so; that he did not advise Vidauri of his right to remain silent. For the first 20 or 30 minutes Vidauri denied involvement. Barton told him he was lying, that the others implicated him and then Vidauri admitted his part in the murder and was willing to make a statement. According to Barton, Vidauri dictated the statement and Sgt. Nash typed it out as he spoke. Although the confession used in the trial was type-written and the purpose of going to the Bertillon room was because there was a typewriter there, Barton testified that Vidauri also wrote one confession himself in longhand, but Barton did not know what had happened to it and did not say why he would want two confessions. Barton's testimony at the original trial was that he had no recollection which hand was used to sign the confession; at the 27.26 hearing, he testified it was the right hand.

Barton offered no explanation for the number of armed troopers present during the interrogation, but said it was not because they were afraid Vidauri might escape. Lt. Barton, Sgt. Nash, and the troopers who signed as witnesses to the confession all denied that any violence, threats or promises were used. Several thought Vidauri had signed with his right hand; others had no recollection. There was general agreement that the troopers were armed with rifles or shotguns and that orders had been issued to shoot to kill.

On this evidence, the trial court made these findings:

"The Court finds as a fact that this petitioner's confession was an involuntary confession under all the facts and circumstances described in the evidence. These include:

1. The number of armed officers present.

---

2. At the 27.26 hearing Vidauri produced a habeas corpus petition which he had signed in his normal right handed way about a year be- | fore the alleged confession, for comparison purposes. This exhibit is not before us, but presumably was seen by the trial court.

2. The awareness of the order to shoot to kill.

3. The age, background and current imprisonment of the petitioner.

4. The denial followed by the 'confession' after a period of interrogation.

5. The manner in which the 'confession' was signed. When taken as a whole the undisputed evidence convinces this Court that the alleged confession was involuntarily given.

". . .

". . . this case comes within the purview of . . . Rule 27.26(i) by virtue of a denial of constitutional rights of the petitioner such as to render the judgment subject to collateral attack . . .

"For the reason set forth in its Findings of Fact and Conclusions of Law filed herein, the verdict of the jury returned September 15, 1955, and the sentence of the Court imposed October 22, 1955, in State vs. Joseph M. Vidauri, cause No. 35 of this court, are ordered set aside and petitioner is granted a new trial in said cause . . . ."

A reading of the complete record leaves certain indelible imprints. It is clear that there had been a good deal of violence in the penitentiary. There was one riot on September 22, 1954 and a second one on October 22, 1954. In the quelling thereof, the highway patrol officers and men were present in force. Six inmates were killed and more than thirty wounded. Without meaning by this statement of fact to cast any aspersions on the highway patrol, the occurrence of these deaths and woundings is certain to have been known to the convict population, including Vidauri. Likewise, the existence of the order to shoot to kill is bound to have been a matter of general knowledge to guards, officers, troopers and inmates alike, including Vidauri. It does not require direct testimony to know it was not a time to argue with the patrol or to be slow to obey.

■ Another outstanding feature here is the large number of armed troopers surrounding Vidauri during his interrogation by Capt. Barton and Sgt. Nash. The show of numbers and powerful weapons was far beyond anything required for safety and preventive purposes. By the time Vidauri was questioned, order had been restored for several days and control of the prison was firmly in the hands of the officials. Capt. Barton said they had no fear of escape by Vidauri. Barton did not offer any plausible explanation for the use of so many troopers in the interrogation. Certainly the circumstances of the interrogation were not conducive to Vidauri's remaining silent or refusing to answer or persisting in denials. It was pretty clear the officers were determined to get answers. There was no reason to believe the officers could not carry out whatever they stated they were going to do. Manifestly they had ample power to do so. The combined effect on Vidauri, who was 19 years old and of a minority and alien nationality, could have been overpowering and terrifying, which it was according to his testimony. And none of this was tempered by the officers giving Vidauri any warnings as to his constitutional right to remain silent or to have counsel. Although this alone would not be determinative, as the events all preceded Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), it does enter into a determination of voluntariness, Haynes v. Washington, 373 U.S. 503, 517, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Coney v. State, 491 S.W.2d 501 (Mo.1973).

The signing of the confession seems to have been done with the left hand, although Vidauri's normal signature was with the right hand. Signing a document with the wrong hand is certainly unusual and is difficult to reconcile with Capt. Barton's testimony that Vidauri after a few denials readily admitted involvement in the crime and dictated a confession to Sgt. Nash on the typewriter. Capt. Barton also testified at the 27.26 hearing that

there were two confessions—one written by Vidauri in his own handwriting (which apparently was what several of the other participants had done) and the one typed by Sgt. Nash. This seems unlikely, and if there was a longhand confession it seems strange it was not produced at Vidauri's trial. Also, if Vidauri were as willing to confess as Barton testified, a second typed confession would seem superfluous.

The interrogation of Vidauri lasted six hours, movant testified. Whatever length of time it was, from five to seven troopers, armed with more than their usual sidearms, were present and intent on the proceedings. None of them could be said to have been friendly or disinterested. According to Vidauri, it was a question of his "either signing a confession or else."

■ ". . . No single litmus-paper test for constitutionally impermissible interrogation has been evolved . . . The ultimate test remains . . .: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process . . ." Culombe v. Connecticut, 367 U. S. 568, 601–602, 81 S.Ct. 1860, 1879, 6 L. Ed.2d 1037, (1961); Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Haynes v. Washington, supra.

It is not our function to make a de novo review on involuntariness, but rather to determine whether the trial court's findings are within the broad area where it cannot be said the trial court was clearly erroneous. There was unquestionably evidence in the record from which the trial court could find that the circumstances were such that movant was deprived of a free choice to admit, to deny, or to refuse an answer, that his will was overborne, and that the confession was not free or voluntary. State v. Smith, 415 S.W.2d 748

(Mo.1967); Coney v. State, 491 S.W.2d 501 (Mo.1973).

The first point relied on by the state for reversal is that the trial court failed to enter findings of fact and conclusions of law as required by rule 27.26(i). The state argues that the trial court made no finding of the specific facts on which the court relied to find that the confession was involuntary. The state joins with this an argument that the movant failed to plead the issue of voluntariness of his confession. In support of its argument, the state cites cases such as Gerberding v. State, 433 S.W.2d 820 (Mo.1968), where the 27.26 motion was denied without an evidentiary hearing on the ground that "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief", Larson v. State, 437 S.W.2d 67 (Mo.1969), where the trial court overruled a 27.26 motion, stating only that after examining the files and records, the court was satisfied that movant was not entitled to any relief and Thomas v. State, 465 S.W.2d 513 (Mo.1971) where, in overruling a motion under 27.26, the trial court put it on the basis that petitioner "was not entitled to come back and take a second bite at the cherry." These cases are of no help. The findings in the present case are in no way similar to the complete lack of findings, exemplified in the cases cited.

In the case before us the court resolved the main factual issue by finding as a fact that the confession was involuntary "under *all* the facts and circumstances described in the evidence", (emphasis supplied), which the court said *included* (but did not say was limited to) five particulars, each of which was set out by the court.

■ With regard to the argument made by the state (although it is not one of the points relied on) that petitioner did not plead the issue of the voluntariness of the confession and that the court failed to stay within the issues defined by the pleadings and evidence, we note that the state cites no authorities support-

ing its position. Petitioner's pro se motion refers to "pre-trial testimony *rigged* for self-incrimination (prohibited)" which is one way of saying that his alleged confession, which fits the description of pretrial testimony, was involuntary. The motion also refers to the circumstances under which the alleged confession was obtained in prison saying it was a denial of due process. There was no objection by the state to introduction of the large amount of evidence going to the issue of voluntariness and the circumstances under which the confession was obtained, which would indicate counsel for the state believed the questions put went to the issue before the court. In the argument by counsel at the close of the 27.26 hearing, counsel for the state argued the question of whether the confession was voluntary and made no claim the matter was outside the pleadings. If it can be said that the motion did not raise the issue, which we doubt, it is clear from the record and the trial court's view of the matter that the issue of voluntariness of the confession was the issue actually tried by common consent and was treated in all respects as if raised in the pleadings, rule 55.33(b).

■ Next, the state contends that the decision of the trial court should be reversed because petitioner failed to preserve the alleged error concerning the admission of his confession during the original trial. The state points out that while the confession was admitted over defendant's objection, the motion for new trial did not contain any reference to the involuntariness of the confession and that the issue of voluntariness of the confession was not considered during the direct appeal, State v. Vidauri, supra. The state would treat this as a waiver of the constitutional objection, constituting a knowing bypass by defendant of the state procedures by which the question could have been considered on the original appeal. We disagree.

In Mahurin v. State, 477 S.W.2d 33 (Mo. banc 1972), this court, in an appeal from denial of relief on a 27.26 motion, reviewed a claim of involuntary confession, despite the fact that defendant, after his conviction in his original trial, had agreed that his motion for new trial should be withdrawn, whereupon he was sentenced, took no appeal and commenced serving his sentence. As in this case, there had been an evidentiary hearing on the 27.26 motion, with evidence for and against on the issue of voluntariness. On appeal, the court considered the claim of involuntary confession on the merits, reviewed the evidence, found the trial court's findings were amply supported, and held that the trial court's conclusion that the confession was voluntary was not clearly erroneous. If the withdrawal of the motion for new trial and failure to appeal in the original trial did not there cut off review of the claim of involuntary confession by motion to vacate under rule 27.26, a fortiori, therefore, it would not under the facts of the prsent case.

In Fields v. State, 468 S.W.2d 31 (Mo. 1971), on which the state principally relies, the court refused to consider, on a 27.-26 appeal, a search and seizure claim which had not properly been preserved for appeal in the original trial. In the Fields case, however, there was no motion to suppress, no objection on constitutional grounds at the trial when the evidence was introduced, and no mention made of the search and seizure claim in the motion for new trial. In addition, in the original appeal, State v. Fields, 442 S.W.2d 30 (Mo.1969) the court had considered but rejected the search and seizure claim, on the basis that defendant had not filed a motion to suppress, as a result of which the prosecutor could have properly assumed that defendant had no objection to admission of the items seized and could further assume it would not be necessary for the state to prove a lawful search and seizure. The case is an example of deliberate bypass of a procedural rule by the defendant. The court in the second Fields case, 468 S.W.2d 1.c. 32, took the position that a 27.26 motion was not, in general, the way to raise an illegal search

and seizure claim, and that it would not consider the claim "under the circumstances of the case."

In the present case the circumstances are much different. Here defendant did object to the confession, first in a hearing before the trial court outside the presence of the jury, and again when the confession was offered before the jury, on constitutional grounds, and was overruled each time. We do not consider the ruling in the Fields case as a "blanket" rule that any and all constitutional objections are forfeited by failure to preserve them in the motion for new trial, Mahurin v. State, supra.

In the case before us, the involuntary confession issue was not submitted and ruled on in the original appeal, or considered in any way, so we cannot say that defendant is seeking to use rule 27.26 to relitigate something already settled.

Defendant was 19 or 20 years of age at the time of his conviction, poorly educated, and indigent. He would have had no idea that his claim of involuntary confession should have been included in the motion for new trial to accord with Missouri procedure. The record shows he was remanded to the custody of the warden of the penitentiary at Jefferson City promptly upon receipt of the verdict. His appointed counsel was from St. Louis and the motion for new trial was filed in St. Charles 30 days after the date of verdict. There is no evidence in the record to indicate an intentional relinquishment or abandonment of a known right or privilege (the requirement for waiver, Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 [1938]) as to what should or should not have been put in the motion for new trial comparable, for example, with Nickens v. State, 506 S.W.2d 381 (Mo.1974), where there was express and unequivocal waiver by defendant of right to file a motion for new trial and right to take an appeal.

It also is significant that counsel for the state, in the trial and argument of the 27.26 motion, advanced no claim of waiver to the trial court or of deliberate and voluntary bypass by defendant of state procedure with respect to the claim of involuntary confession or of abuse of process—i. e., a deliberate failure on the part of movant to present his claim of involuntary confession in his post trial motion with an intention to present it later by means of a 27.26 motion. Counsel's defense for the state was that the confession was, on the facts, voluntary and the court should not accept defendant's testimony as to how the confession was obtained. Indeed, the state's claim of bypass or waiver, being raised on appeal for the first time, is an attempt by the state to do what they accuse defendant of doing—raising an issue on appeal not raised or properly brought to the attention of the court below. The state should have raised the point by a motion or in some other fashion brought it to the court's attention. See Smith v. State, Mo., 513 S.W.2d 407 (decided July 22, 1974), where the state used motion practice in opposing a 27.26 motion.

If the state's argument is adopted, then defendant is barred from consideration of his claim that the officers obtained his confession in an unconstitutional manner, even though by established law "It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession . . . and even though there is ample evidence aside from the confession to support the conviction . . .", Jackson v. Denno, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964).

■ We do not hold that there could not be a deliberate bypass on the part of a defendant of procedural remedies sufficient to bar consideration of a claim of involuntary confession on a 27.26 motion, Nickens v. State, supra. But the present is not such a case and to hold otherwise

could be a manifest injustice. One purpose of rule 27.26 is to provide a means of avoiding the perpetration of injustices of grave constitutional importance.

The state's final contention is that the decision should be reversed because the finding that the confession was involuntary is clearly erroneous. While citing well-known cases on the scope of review on 27.-26 appeals, the state cites no case in point on the facts before us. The state's position is that since there was a hearing held before the court outside the presence of the jury on defendant's objection to the admission of his confession on the ground it was involuntary, and then, when the confession was admitted in evidence, over objection, the same evidence was presented to the jury as earlier presented to the court, and since both the court and jury ruled against defendant, as shown by the action of the court in admitting the confession and the jury in finding defendant guilty, a contrary ruling by the court on the 27.26 motion must be clearly erroneous.

■■■ Aside from the fact that the state's position would seem to lead to the conclusion that once the trial court has ruled in a given case, its ruling is automatically controlling as to any post-conviction proceeding, a basic flaw in the argument is that the court in the original trial made no finding as to voluntariness of the confession. After hearing the evidence pro and con, outside the presence of the jury, the court made no ruling whatever, other than to instruct the prosecutor, when proceedings were resumed in front of the jury, to proceed. The prosecutor then identified defendant's signed statement by Lt. Barton and the various state troopers who were present when it was obtained and offered it in evidence. Defendant's counsel again objected on the ground of involuntariness, the court overruled the objection, and the exhibit was read to the jury. This procedure was substantially in accord with the practice commonly followed in Missouri in 1954, State v. Di Stefano, 152 S.W.2d 20 (Mo.1941), (this being before Jackson v.

Denno, supra), but we do not consider the simple overruling of the objection as equivalent to a finding of the facts on the issue of voluntariness as it was presented in the 27.26 hearing before us. There was substantial conflicting evidence on the issue in the original trial, and, as said in State v. Di Stefano, supra, 152 S. W.2d 1, c. 21, " . . . when there is substantial conflicting evidence and the question is close it is better to refer the underlying issue of voluntariness to the jury than to exclude the confession . . . " Moreover, the trial court in the 27.26 hearing had facts before it which were not before the court in the original trial and the fact that one trial judge reaches a conclusion different from another does not mean that the second judge is clearly erroneous.

Additionally, the record does not support the claim that the jury by its verdict found the confession to be voluntary. The court gave the jury an instruction, which, in substance, was that if the jury did not believe it was voluntarily made, they should disregard it, but if they believed it was voluntarily made, they must consider it. However, there is no way to determine from the general verdict of guilty by the jury which determination they made. As the court pointed out in the opinion on the original appeal, there was evidence other than the confession on which the state made a submissible case, State v. Vidauri, supra, 293 S.W.2d 1, c. 956, and so no one can say whether the jury, in arriving at a finding of guilty, determined the statement was given voluntarily and thus subject to their consideration.

■■ There was abundant evidence before the trial court on the 27.26 motion on which it could find that the confession was involuntary. The trial court had before it the key witnesses in this dispute and had the duty to determine their credibility. We have consistently deferred in these 27.26 appeals to the fact findings of the trial court where supported by evidence (see numerous cases found in 9C, Mo. Digest,

Criminal Law, Sec. 1158). Generally, 27.-26 appeals are by movants, but of course, the same rules on review apply where the appeal, as here, is by the state. The trial court exercised the discretion with which it is clothed as the trier of fact and ruled in favor of the movant. Ours is not a de novo review and we cannot say the decision was clearly erroneous.

Judgment affirmed.

BARDGETT, P. J., concurs.

HOLMAN, J., concurs in result.