STATE of Missouri, Respondent,

v.

Earl BRYDON, Appellant.

No. WD 31959.

Missouri Court of Appeals,
Western District.

Dec. 22, 1981.

Cullen Cline, Butcher, Cline & Mallory, Columbia, for appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for respondent.

Before KENNEDY, P. J., and SHANGLER and WASSERSTROM, JJ.

The defendant was convicted of the deviate sexual assault in the first degree [§ 566.070, RSMo 1978] practiced upon a foster-daughter and was sentenced to a two-year term of imprisonment. The pros-

ecution resulted from an incident of child abuse reported under the procedures of Child Protection, Chapter 210 of the statutes. The defendant contends, among other errors, that the evidence for conviction were statements given in confidence protected by law from disclosure and otherwise involuntary.

The defendant Brydon and wife were the foster parents of the female child $N$ then fifteen years of age. The child and a brother were in the custody of the Brydons as foster parents for some three years. On April 23, 1979, witness Munson, a private practitioner of psychology and family therapy—then a counselor with the Family Service [a private enterprise] in Columbia, Missouri—received an anonymous telephone call. The caller intimated that a sexual contact occurred between her husband and a fifteen-year-old "daughter" and sought her professional counsel. The witness Munson explained that she was under the obligation of the law to report any incident of sexual abuse to the Division of Family Services. The caller expressed concern about that condition and discontinued conversation. The caller telephoned again that day to identify herself as Lovedy Brydon [wife of the defendant]. On that subsequent occasion, witness Munson told her that "we would probably have to report" [the incident]. Ms. Brydon made an appointment with the counselor-therapist for the following Thursday, April 26th. [The Munson testimony mentioned another telephone conversation with Ms. Brydon on April 24th, but the contents are not mentioned.]

On that Thursday, the Brydons were present with foster daughter $N$ at the office of counselor Munson. The witness Munson narrated that event: There was no verbal exchange among them until after counselor Munson advised them that she "would have to report this to the Division of Family Services." The defendant said nothing to that, but remained. Ms. Munson then initiated conversation by inquiry to the family whether they were aware of the telephone calls to her. The wife of the defendant responded that she had told the

family she had called counselor Munson after information from $N$ on Monday [April 23] morning that "sexual contacts had begun again." To that the defendant made response that "he felt badly about the situation. He was concerned about $N$ and felt that he needed counseling." That same day, Ms. Munson made verbal report of the incident to the Division of Family Services and then in short time submitted the formal written report—each as required by statute [§ 210.115 and § 210.130]. That same day, also, social worker Keen of the Division met with the defendant and wife at the residence—and that same day $N$ and the brother were removed to another foster home.

The defendant Brydon remained under the ministrations of counselor Munson as a private patient. The therapy extended over seventeen sessions but treated only the anxiety and depression engendered from the marital dislocation. There was no counsel on the "sexual problem" because the defendant, by then advised by an attorney, refused the subject.

The telephone report to the Division of Family Services by counselor Munson prompted an urgent inquiry by Anne Keen, a child protective service worker of the Division. She reached the defendant at home by telephone that very day [April 26], identified her interest, and arranged to meet with the husband and wife at the residence that evening. The testimony of worker Keen was that she initiated the encounter by a personal introduction and that she was there to discuss a report of sexual abuse made to Ms. Munson and then reported to worker Keen. Ms. Keen then asked them for the "underlying reasons as to why this ... situation has occurred." The Brydons asked that she clarify the inquiry. To that, Ms. Keen put the question: "if they would like to share any problems that they had been having in their marital situation." The defendant Brydon [by her report] by a speech "very slow, deliberate and intent" replied that "he could not blame what had happened on his marriage, but instead he felt like he had to take full responsibility for what had happened." Ms.

Keen explained to the Brydons further that it was important to an effective work with N as a foster child "to understand the extent of the sexual involvement from them instead of initially from N. So, I had asked them basically to help explain that to me." The defendant continued to find an explanation difficult, so Ms. Keen suggested a description of the sexual event in terms of degree: "I asked them to describe it to me in a manner of degree[s] being mild, moderate, or serious sexual involvement."

Q. What did each of those categories mean?

A. I then gave a definition and I said mild would entail kissing or fondling, moderate would be finger play, and serious would mean intercourse.

Q. Did Mr. Brydon reply?

A. Yes, he did. He said the word serious.

Q. What did you do at that point?

A. The next thing I discussed with them was their legal position in the sense I told them there might be felony charges filed against them and possibly a lawsuit from the parents of N., just to inform them of the possibilities of that situation.

Q. Mr. Brydon respond to that?

A. Yes, he did. He had asked what that involved in terms of a court situation and asked if it would be necessary for the children to testify. I said based on my experience, yes, the children do have to testify in sexual abuse cases. He then remarked he never wanted N to have to testify and would plead guilty so she would not have to go through another traumatic situation. He also said he would—he again confirmed his feelings of taking full responsibility for this situation and made the statement he would need to take the consequences of his actions.

The children, N and brother, were removed from the Brydon home that evening. Two days later [April 28] the defendant Brydon telephoned Ms. Keen to express concern as to whether he needed an attorney—earlier conversation with Ms. Munson left the impression that prosecution was unlikely and so such a recourse unnecessary.

Q. What did you say to Mr. Brydon?

A. I told him that he needed to secure an attorney.

Q. And what did he reply?

A. He said he would plan on securing an attorney and that he did not want N to have to testify in Court. He again told me he would plead guilty.

The child N related that on that April night the defendant [foster father] Brydon came into her bedroom. N was in bed. The defendant asked where Lovedy [his wife] was. N answered that Lovedy was at a meeting. The defendant said: "Good," left and then returned unclad. He slipped into the bed and commenced to fondle her body—in the words of the witness: "[m]y breast and my lower part." The defendant touched her genitals, lay upon her, kissed her face. She resisted, told him to "get out of here," that she was going to tell Lovedy, but he persisted, performed the cunnilingus perversion and then the normal act of frontal sexual intercourse. The defendant finally left. The next morning she reported the event to foster mother Lovedy. The telephone call to Ms. Munson and the inquiry by the Division worker Keen ensued.

The defendant Brydon gave testimony. His narrative was brief: he admitted that on the night of Sunday, April 22, while wife Brydon was away from the home, he made advances to N. He entered into her bed, put his arms around her, and attempted to disrobe her pajamas. She resisted, so he left. He denied any other intimacy, tactile or overtly sexual.[1]

1. The tenor of the testimony was evasive and circumlocutive. The deviate sexual assault alleged against defendant Brydon was as to conduct practiced upon the child N on April 23, 1979. The evidence was that the encounter commenced at about 11:00 p. m. on Sunday, April 22, 1979. There was no testimony as to how long the defendant persevered—but, from the evidence of the child N as to the two appearances by the defendant, her continued re-

In limine, the defendant moved to suppress the admissions to counselor Munson and social worker Keen on grounds that they were rendered involuntary by [unspecified] promises and statements guised as an offer for counsel, but with actual purpose to gather evidence for a prosecution. The trial of that motion does not appear in the transcript but we surmise from other entries that the question was presented to the court on memoranda and, on due consideration, denied. The defendant attributes three errors to that action: (1) that the court made no formal finding that the statements were voluntary, (2) that under the evidence the statements were induced by false statements and promises and so involuntary as a matter of law, (3) that the admission of the statements into evidence compelled the defendant to give testimony he would have withheld otherwise and so violated that prerogative under the Fifth Amendment.

■ The first contention—that the trial court "failed to rule" with unmistakable clarity on the voluntariness of the confessions—[so we understand] impugns the adjudication for want of express grounds for decision. The record of that proceeding and order are not before us so we are unable to assess the complaint. On principle, nevertheless, the finding of a voluntary confession suffices if the validity of that adjudication "appear from the record with unmistakable clarity." *Sims v. Georgia*, 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1967). The trial court need enter neither formal findings of fact nor an opinion to sustain decision. *State v. Garrett*, 595 S.W.2d 422, 429[6, 7] (Mo.App.1980). Thus, the appeal posits the essential inquiry: whether the determination that the confes-

sistance, and his multiple advances and consummations, the inference arises that the criminal conduct extended over more than an hour into Monday, April *23*, 1979.

The final form of the information—by the bill of particulars—charged a deviate sexual assault on April *23*, 1979. The frame of the questions was in terms of April *23*, 1979. The defendant parried the effect of the extrajudicial admissions to Munson and Keen of a sexual encounter with the child *N* by responses which deliberately assumed that the assault on April *23* charged against him by the information rested on discontinuous conduct—that is, separable between April *22* and April *23*. Thus, to the direct question, iterated and reiterated: "Did you have sexual intercourse with *N*?", the defendant answered: "Not that night." When confronted with the testimony by Keen that he admitted his involvement with *N* was "serious" [that is, sexual intercourse, by the definition of that term assumed by both interrogator and the defendant], Brydon merely answered that the inquiry was as to April *23*, not April *22*:

Q. And when Anne Keen asked you what your involvement was with *N*, how did you describe it?

A. Anne Keen asked me what involvement I had had with *N*. She did not ask what involvement on the night of the 22nd.

Q. But the comments immediately preceding that were dealing with the 22nd, weren't they?

A. Not that I—well, it was just that this was brought to the attention of everybody on the 23rd.

Q. What did you say about that contact then right after they talked about why you came into this office? How did you describe the sexual contact you had with *N*?

A. Anne Keen asked me what was my involvement, what had my involvement been. Now, she was not specific. She didn't say on the night of the 22nd. She asked me what my involvement had been with *N*.

Q. And what did you say?

A. I said, "Well, it's hard to say." She said, "To help you, I will give you three definitions."

\* \* \* \* \* \*

Q. Moderate, mild, and serious?

A. Mild, moderate, and serious, and she said serious would be sexual intercourse.

Q. And what did you respond?

A. I answered that it was serious.

This evidence allows inference of an admission by the defendant that he consummated an act of sexual intercourse with the child on April 22. The total evidence allows inference that the sexual misconduct charged against the defendant—a deviate sexual assault by cunnilingus and other described dalliances—continued into April 23 so that an assault upon the child *N* was confessed, albeit not a *deviate* assault under § 566.070—which was proved by other evidence.

There is no issue on appeal of a variance between the formal charge of the information and the proof adduced by the prosecution. The contention on appeal [among others] is, rather, that the testimony of the defendant was forced and that his statements to Munson and Keen were involuntary: that the defendant was compelled to take the stand to rebut that unlawful evidence. We treat these contentions in the course of opinion.

sions by defendant Brydon were voluntary appears clearly from the record to rest on a preponderant proof. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972); *State v. Pugh*, 600 S.W.2d 114, 118[5, 6] (Mo.App.1980).

 The defendant acknowledges at outset that *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), does not apply. That rule operates only as to statements taken during a custodial interrogation by law enforcement officers, and not as to response to a private citizen given free from restraint. *State v. Kelly*, 439 S.W.2d 487, 489[1] (Mo.1969); *United States v. Delay*, 500 F.2d 1360, 1364[5, 6] (8th Cir. 1974). The defendant contends, rather, that the admissions of guilt to Munson and Keen were unlawfully induced by the subterfuge of promises and a misdirection of confidence. The law forbids the use of a coerced confession because the method of extraction offends constitutional principle intolerably [*Lego v. Twomey*, supra, 404 U.S. l.c. 485, 92 S.Ct. 624], therefore, a conviction founded on such evidence deprives a defendant of due process of law. *Vidauri v. State*, 515 S.W.2d 562, 569 (Mo. 1974).

 The question of the voluntariness of confession turns on the totality of the circumstances. *Boulden v. Holman*, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139, 22 L.Ed.2d 433 (1969); *State v. Flowers*, 592 S.W.2d 167, 168[1] (Mo. banc 1979). The factors are as various as the circumstances, therefore, and no single consideration predisposes the determination. *Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). The age, experience and intelligence of the declarant are among the salient considerations in that *de facto* assessment. *State v. Barnett*, 338 S.W.2d 853, 856[3] (Mo.1960); *State v. White*, 494 S.W.2d 687, 691[7] (Mo.App.1973). Withal, the ultimate test of a voluntary confession becomes: Was the inculpation the product of a free will? *State v. Flowers*, supra, l.c. 169. The defendant Brydon contends that his admissions to Munson and Keen were induced by trumpery and deception—a spe-

cies of psychological coercion—and so were involuntary. That argument reduces to complaints that Munson induced a belief of leniency that Keen enlisted his interview by a representation that the purpose was to help *N*, and that the defendant as to both of them acted on the reasonable belief that the relationship was for personal counsel in confidence.

The argument as to Munson ignores her evidence. It may be that the defendant believed consultation with Munson, after the wife made overture for her services, would allay the probability of prosecution. If so, the evidence allows inference that such a belief was not reasonable. That argument rests on the perception of the defendant—reported by wife Lovedy to worker Keen and recorded on her official case form—that "Earl [the defendant] doesn't think it is necessary to get an attorney based on his conversations with Jan Munson." It was that report by wife Lovedy which prompted worker Keen to tell defendant Brydon: "Wait a minute. I want to make certain you understand you probably ought to get an attorney." The testimony of Munson, who was the initial communicant, was that on that first occasion of conversation with [the then anonymous] wife Lovedy, Munson informed her the law required that any report to her of an incident of sexual abuse must be conveyed to the Division of Family Services. It was that warning that cast doubt she and the husband would come to the Munson office for counsel. Notwithstanding, the wife called back that day—again was informed by Munson that "we would probably have to report [the incident of sexual encounter]." The interview of April 26 occurred under those auspices.

The provisions of § 210.115 bind one in the position of therapist Munson, who has reasonable cause to suspect that a child *has been or may be* subjected to sexual [among other] abuse, to report the information *immediately* to the Division of Family Services. The provisions of § 210.130 then require that a written report to the Division follow within forty-eight hours. The fail-

ure to report incurs criminal penalty § 210.-165. The law then requires the Division to make thorough investigation of the report of abuse and then, as the result of investigation may prompt, to report "to the appropriate law enforcement authority." [§ 210.145.7]. The advisement by Munson that a report would go forward to the Division of Family Services upon a disclosure of a sexual abuse was a fair representation of her required course, and any sense that these communications conveyed a promise not to prosecute was only a personal musing, and not a reasonable surmise.

■ Nor do the full circumstances of the relationship imply otherwise. The defendant had reason to know that Munson was a private practitioner, and not a police official or surrogate. He engaged her for private therapy counsel and paid for the services. There was no reason to believe that the disclosures to Munson of the sexual encounters with a child were in confidence. The defendant was already warned that a report would issue to an official agency. The argument that the terms of the statutes engendered such a belief is totally without ground. The express § 210.150 protects the confidentiality of such reports *except* to [§ 210.150.1(4)]:

> "A grand jury, juvenile officer, juvenile court *or other court conducting* abuse or neglect or child protective *proceedings* . . . ." [emphasis added]

Nor does the communication privilege between a person and a licensed psychologist [Munson] in the course of professional services established by § 337.055 appertain to sustain contention. That general text is preempted by § 210.140 of the Child Protection chapter:

> Any legally recognized privileged communication, except that between attorney and client, shall not apply to situations involving known or suspected child abuse or neglect and *shall not constitute grounds for failure to report as required or permitted by sections 210.110 to 210.-165 . . . or to give or accept evidence in any judicial proceeding relating to child abuse or neglect.* [emphasis added]

The contention that the representation by Division worker Keen that the purpose of interview was "to help the child" was a false inducement to confession is less fathomable. That was the purpose agreed on between them and foregone, and that was the purpose practiced. The evidence of defendant Brydon shows as much. The removal of the child from the Brydon household that very evening after the interview [April 26], the transport of the child and worker Keen by Brydon himself to accomplish that purpose, all attest that concern for the child was the paramount motive for the inquiry by the Division of Family Services. Indeed, the acquiescence at all to the interview, the several responses by Brydon that he would not testify to spare the child N needless trauma, his acceptance of "full responsibility," and his amenability to therapy all manifest that the concern for the child was not only a profession of purpose by Keen, but a desideratum shared by Brydon. The sense conveyed by Keen to defendant Brydon that his interview was enlisted "to help the child" comports precisely with the role assigned by statute [§ 210.-145.4]:

> "the primary purpose of such [Division of Family Services] investigation [is] the protection of the child."

■ Immediately upon the descriptions of the sexual contact by Brydon, worker Keen informed him "of the possibilities of the situation" that "there might be felony charges . . . and possibly a lawsuit from the parents of N." The defendant appears to contend that Keen owed him warnings *before* the disclosures of the sexual activity that a charge of felony against him was possible for that conduct. The defendant does not say, however, on what principle that duty arose. He concedes *Miranda* does not apply. The defendant was not in custody at the time the admissions were made to the inquiry, but at his private residence; nor was he deprived of freedom of action in any way. *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976). The worker Keen was there with permission and would

have been obliged to leave without it. And although in the discharge of an official duty at the time, she was in no sense a prosecution officer. She was without authority to make a criminal investigation and undertook none—albeit the Division was empowered to "report to the appropriate law enforcement authority" any result of investigation. [§ 210.145.7]. The statements to Keen were as to a private individual. *State v. Ayers*, 470 S.W.2d 534, 537[6] (Mo. banc 1971); *State v. Kelly*, 439 S.W.2d 487, 489[1] (Mo.1969). It may be that the statements by Brydon to Keen were the point of beginning for the prosecution [although the disclosures already made to Munson could have served as readily], but that says no more than that any voluntary admission may lead to a criminal charge. *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976). Evidence that warnings of some kind were given or were not given bear within the totality of circumstances only on whether the interrogation was coercive *de facto*. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969); *Coney v. State*, 491 S.W.2d 501, 507[5, 6] (Mo.1973). The record clearly shows by a preponderance of the evidence that the interview between the defendant and Keen was free of coercion.

■■■ If the defendant means to contend that the statements to worker Keen were confidential so that the disclosures without consent rendered those admissions involuntary, that argument rests on neither principle nor fact. The law does not endow the communications between a social worker and client with any such privilege. [The terms of § 210.140 would render the privilege inapplicable in any event.] Nor does the evidence show any inducement by worker Keen to inveigle confession from Brydon by a promise of nondisclosure.

■■■ The contention that these statutes are intended for child protection and not as tools for criminal prosecution so as to prevent statements given in such course for use as confessions also misreads the legislative policy. It may be that the predecessor enactments—as well as the Model Act and the federal prototype—served a more pristinely sociological purpose: to report incidents of child abuse and to provide for prevention of recurrence by therapy. To those features the present law adds the possibility of punishment. [§§ 210.145 and 210.150]. See Krause, *Child Abuse and Neglect Reporting Legislation in Missouri*, 42 Mo.L.R. 207, 209 et seq. (1977).

We deny the cognate contention that the reception in evidence of the statements compelled Brydon to give evidence against his inclination and so violated the privilege against self-incrimination accorded by the Fifth Amendment. The trial court determination that the statements were voluntary shows clearly from the evidence.

The defendant argues next that the reception in evidence of the testimony of witnesses Munson and Keen as to statements made by Brydon violated the hearsay rule as well as the privilege of an accused to avoid the adverse testimony of a spouse in a criminal prosecution. The imputation of error alludes to two incidents of testimony. The first: the trial narrative by Munson that on the occasion of the first interview with husband and wife Brydon and foster daughter *N* [April 26 morning], wife Brydon explained to the witness "she had made the phone call after learning from *N* . . . on Monday morning [April 23] that sexual contacts had begun again." The second: the testimony by Keen, also on the occasion of the first interview with the husband and wife Brydon and foster daughter *N* told her on Monday [April 23] " 'Earl [Brydon] had done it again. He had come into her bedroom.' At that point Mrs. Brydon said that that was the third time she had been informed of something going on and wanted . . . . " The defendant objected to the Munson testimony as hearsay. That objection was overruled. The defendant objected to the Keen testimony as "bringing out uncharged offenses not material and highly prejudicial" and also as hearsay. The court sustained the objection to the imputation of prior occurrences but overruled the contention of hearsay.

The evidence was properly received as the tacit admissions of the defendant Brydon. That rule postulates that a statement made in the presence of another which incriminates that other, and to which that other neither objects, nor denies, nor contradicts, is admissible in a criminal prosecution against that other, both as an acquiescence in its truth [that is, as a tacit admission of the facts stated] and as indication of a consciousness of guilt. *State v. Samuel*, 521 S.W.2d 374, 375 (Mo. banc 1975). The conditions for the operation of that rule of evidence are: (1) a statement made in the presence and hearing of the accused, (2) a statement sufficiently direct as normally would call for a reply, (3) a statement *not* made at a judicial proceeding or while the accused was in custody or in arrest. *Samuel*, supra, l.c. 375[1]. These conditions met, the statements have the effect of extrajudicial admissions, albeit the declarant does not testify. *State v. Bolder*, 534 S.W.2d 545, 547 (Mo.App.1976).

The evidence shows that on the occasions reported by Munson and Keen the defendant Brydon was present when wife Lovedy declared—on the one occasion—she learned from the child N that "the sexual contacts had begun again"—and on the other—that "Earl [Brydon] had done it again. He had come into her bedroom." That the declarations by the wife were direct incriminations of the husband [so as to elicit objection from one innocent of the conduct ascribed] shows from the context of the events. The declaration by the wife to Munson [to which defendant now objects] came *after* the interview disclosure by wife Lovedy that "she had learned that there had been sexual contact between her husband and 15-year-old daughter." The declaration by the wife to Keen came *after* the defendant described to worker Keen that the sexual involvement with child N was "serious"—that is, the act of intercourse. Also, *both* declarations were made in the course of interviews for the very purpose— shared by defendant Brydon—to treat and meliorate his disposition for sexual dalliance with the child. Nor was Brydon then under official accusation or custody so that the

failure to object or contradict the declarations was protected by the *Miranda* Fifth Amendment principle against compelled self-incrimination. *Samuel*, supra, l.c. 376[2]. The testimony by Munson and Keen of the declarations of wife Lovedy were admissible against the defendant as tacit admissions of those facts.

The defendant seems to contend that the tacit admission rule notwithstanding, the statements are not admissible against a defendant in a criminal cause when the declarant is a spouse. The defendant poses *State v. Richardson*, 194 Mo. 326, 92 S.W. 649 (Mo.1906) as authority. The conviction in *Richardson* rested on statements by the wife in the presence of the husband and one Schade that the husband wanted to shoot the deceased but that she [the wife] begged him not to. This evidence was presented by the testimony of Schade. The court overturned conviction on the premise [l.c. 653]:

> Mrs. Richardson, who was making the statement against this defendant, was his wife. She was incompetent as a witness to testify to such statement so made, and it necessarily follows that, if she could not make the statement as a witness, she could not make it to a third party, and have him repeat it and thereby violate one of the fundamental rules of evidence applicable to the competency of witnesses; that is, that it is incompetent for the wife to give evidence against the husband
>
> . . . .

*Richardson*, of course, rests on the common law rule that one spouse was *incompetent* either to give testimony for or against the other or to disclose confidential communications of the marriage. That early disability was removed by statute [presently, § 546.-260] to permit one spouse to testify on behalf of the other in a criminal case at the option of the defendant spouse, but the enactment retained the confidential communications stricture intact. *State v. Euell*, 583 S.W.2d 173, 175 (Mo. banc 1979). Even at common law, however, the incompetency did not appertain to prevent the

testimony of the wife against the husband for injury done or threatened to her person. *State v. Richardson*, supra, 92 S.W. l.c. 653; *State v. Koelzer*, 348 Mo. 468, 154 S.W.2d 84, 86[5] (1941). That exception rests on the necessity to protect the wife—otherwise without remedy—and considerations of public justice. *State v. Newberry*, 43 Mo. 429, 430 (1869). That exception to the common law rule of spousal testimonial disability was unaffected by the statute and survives. *State v. Kollenborn*, 304 S.W.2d 855, 861[9, 10] (Mo. banc 1957). The courts continue to receive the testimony of a wife to prosecute a husband not only for injury to the spouse but also for injury to a child or step-child on the rationale [*Kollenborn*, supra, l.c. 863] that a crime against the child of the family is equivalent to a crime against the spouse. A child committed to the protection of foster parents logically comes within that ambit. The declarations of wife Lovedy in the presence of the husband defendant and reported in evidence by Munson and Keen were lawful evidence.[2]

■ The defendant contends next that the refusal of the trial court to allow the testimony of the character witnesses proferred by the defense was error. The three—possibly four—character witnesses were disclosed to the court and prosecution counsel on the day of trial at a conference prior to the voir dire. They were not given in response to the prosecution request for discovery. The counsel for the defense explained:

> The first I knew of these witnesses was two days ago, Your Honor, and I got busy yesterday and failed to notify the Prosecuting Attorney about it. It is my fault I didn't notify her. I will have them here at I think 1:30 or slightly before, and I don't feel real strongly one way or another, but I probably should have notified— in fact, I should have notified the Prosecuting Attorney, but it just slipped my mind. I got busy on some other things.

The prosecutor objected that the sudden request allowed no time for investigation of witness bias and other data. The court reserved decision. The proffer was renewed by the defense that afternoon, and the objection of the prosecution was then sustained for tardy disclosure. The defendant argues that the exclusion of the witnesses was too harsh a sanction. Rule 25.16 provides exactly that a court may exclude the evidence for failure to give discovery. The penalty issues on discretion, not disturbed on appeal unless the choice of sanction results in a fundamental unfairness to the defendant. *State v. Washington*, 570 S.W.2d 838, 842[2–4] (Mo.App.1978). The antecedent circumstances, the reasons for noncompliance with discovery, the nature of the evidence excluded, all sustain that the order was an exercise of a discretion without unfairness to the defendant.

■ The last contention complains of instruction error. The defendant was convicted of deviate sexual assault in the first degree [§ 566.070]. The elements of offense are a deviate sexual intercourse with another person the defendant is not married to who is incapacitated or is fourteen or fifteen years old. The defendant contends that the court was obligated to submit an attempted deviate sexual assault in the first degree, sexual abuse in the third degree and indecent exposure—all lesser included within the elements of § 566.070 on which conviction rests. The attempt, of course, submits an inchoate offense—commenced by a substantial step but not completed [§ 556.046.1, MAI–CR2d 18.02]. The elements of sexual abuse in the third degree are that the defendant subject a person to whom he is not married to sexual contact without the consent of the other. [§ 566.120, MAI–CR2d 20.20]. Indecent exposure charges the defendant with the knowing exposure of genitals when the de-

---

2. We rest decision of the question on the developed extrapolation of the common law principle. For that reason we do not consider whether incriminations uttered by one spouse against the other spouse, then present but who does not object, and reported on the witness stand by a third person, also present, amounts to a tacit admission under the rules of evidence but also a tacit exercise of option on the part of defendant that a spouse may testify as to those statements within the sense of § 546.260.

fendant knows the act will cause affront or alarm. [§ 566.130, MAI–CR2d 20.22]. The motion for new trial recites merely: "[T]he Court erred in failing to instruct on lesser included offenses. The Defendant testified that he entered the room with the intention of having sexual contact with the complainant and that he put his arms around her but left when she resisted. The evidence showed that the Defendant may not be guilty of the offense charged but that he may be guilty of an offense necessarily embraced in the charge."

 To preserve for appellate review the contention of error that the trial court failed to instruct on a lesser included offense, the motion for new trial must recite the facts in evidence which warranted the failed submission. *State v. Stuebinger*, 552 S.W.2d 338, 339[1] (Mo.App.1977). The new trial motion describes neither an attempted deviate sexual assault in the first degree, nor a sexual abuse in the third degree, nor an indecent exposure. The most generous application of principle allows us to read that recital to contend only that the defendant attempted a sexual contact with the child but relented upon resistance. The defendant, of course, was convicted of deviate sexual assault in the first degree—and not of an undifferentiated *sexual contact.* That crime was submitted on evidence by the child that Brydon entered her bed unclad, fondled her breast and then the pudendum and then performed cunnilingus. The indirections and circumlocutions of the Brydon testimony, however tentative and qualified, are reasonably understood as admission to frontal sexual intercourse only, and not as a prelude to deviate sexual conduct. Whatever that evidence, the defendant was accused, tried and convicted of a *deviate* sexual conduct in the first degree,[3] and not of a sexual assault without deviate

manifestation. The defendant insistently denied any purpose for deviate gratification: that any manual or labial or lingual probe of the genitals of the child was intended or attempted. A trial court must instruct on all lesser included offenses supported by the evidence. *State v. Smith*, 592 S.W.2d 165[1–3] (Mo. banc 1979). Unless the normal act of sexual intercourse inherently constitutes a *substantial step*[4] toward the commission of a deviate sexual intercourse in the first degree [the crime charged]—an hypothesis we do not accept—then, there was no evidence of an attempted deviate sexual assault and so no basis for a jury submission.

We would be more ready to agree that the evidence by Brydon that he entered the room with the intention of sexual contact[5] [that is, to touch with the purpose to arouse or gratify the sexual desire of the other] with *N* and that, to that end, he put his arms around her but left when she resisted—proves a sexual abuse in the third degree [§ 566.120] so as to require submission as an offense included within deviate sexual assault in the first degree, were that the full sense of the Brydon testimony. [See *State v. Gibson*, 623 S.W.2d 93 (1981) ]. The evidence of the defendant, however, admits not only an intention to gratify by touch but the consummation of sexual desire by an act of sexual intercourse—that is by the penetration of the male genital into the female orifice. That full evidence admitted also that he attempted to pull off her pajamas, but she resisted—thus the consummation by sexual intercourse was without consent and proves a rape under § 566.030—albeit rape not charged.

 There were two versions of the events: The prosecution proved a deviate sexual assault [charged but not admitted by

---

3. Section 566.010. *Chapter Definitions*—1. As used in this chapter:

 \* \* \* \* \* \*

 (2) " '*Deviate sexual intercourse*' means any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person . . . ."

4. See § 564.011.1; MAI–CR2d 18.02 and 33.01.

5. Section 566.010.1(3) defines *sexual contact* to mean:

 "any touching of the genitals or anus of any person, or the breast of any female person, or any such touching through the clothing, for the purpose of arousing or gratifying sexual desire of any person."

the defendant] *and* a nonconsensual forcible rape [not charged but admitted by the defendant]. The defendant gave evidence of a forced sexual intercourse [not charged] *but* denied any deviate sexual conduct upon *N* [as charged]. In either version the petty *sexual contact* was merely an incident of a more serious criminal culmination—the manual and lingual play with the female organ in the one case, and the non-consensual priapic penetration in the other. There simply was no evidence of a *sexual contact* as a completed offense, discrete and unrelated to the admitted frontal intercourse or to the accused deviate intercourse. The tender of the sexual abuse in the third degree instruction was therefore properly rejected.

The judgment is affirmed.

All concur.