



# Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

STEVIE DEWAYNE JONES, Appellant

No. 05-90-01026-CR      V.

THE STATE OF TEXAS, Appellee

Appeal from the 265th Judicial District Court of Dallas County, Texas. (Tr.Ct.No. F88-81145-PR).

Opinion delivered by Justice Kinkeade, Chief Justice Enoch and Justice Baker participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered May 27, 1992.

_____

ED KINKEADE
JUSTICE

**Affirmed and Opinion Filed May 27, 1992**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

---

### No. 05-90-01026-CR

---

### STEVIE DEWAYNE JONES, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 265th Judicial District Court
Dallas County, Texas
Trial Court Cause No. F88-81145-PR**

---

## OPINION

Before Chief Justice Enoch and Justices Baker and Kinkeade
Opinion By Justice Kinkeade

Stevie DeWayne Jones appeals his conviction for murder. Following a jury trial, the jury assessed punishment at thirty years' confinement in the state penitentiary. In nine points of error, he argues that (1) the evidence is insufficient to support his conviction and (2) the admission of suggestive, pre-trial photographic lineups tainted the in-court identification of two witnesses. He further argues that the trial court erred in admitting (3) the hearsay testimony of four witnesses and (4) evidence of extraneous offenses. Because

the evidence is sufficient to support Jones's conviction, the in-court identifications were not tainted, and the trial court did not err in admitting the four witnesses' testimony under exceptions to the hearsay rule and the extraneous offenses to show Jones's motive to kill Graves, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL HISTORY

Yolanda Graves and Stevie Jones met and began dating in high school. After Jones started buying Graves expensive presents and taking her on trips, Graves's father, W.D. Johnson, asked her to move from his house. At this time, Graves also dated Jerry Wayne Leffall, who is known as both "John" and "Chief."

### The Leffall Shooting

At about 5:30 to 6:00 P.M. on March 6, 1988, Jerry Wayne Leffall took Frederick Hunter to the grocery store to buy cigarettes. Leffall waited in the car as Hunter went into the store to buy cigarettes. While Hunter was in the store, Jones drove up and parked behind Leffall's car. Jones then got out of his car and walked to the driver's side of Leffall's car. Jones asked Leffall if his name was "John." Leffall told him "no," and Jones fired at him twice. Leffall laid on the seat of his car and pretended to be shot. Jones stepped back and started shooting again. Jones then got back into his car and shot at Leffall again before he left. When he heard the shots, Hunter ran out of the store, opened Leffall's car door, and saw that Leffall was not hurt.

The two then went to Hunter's house and called the police. Dallas Police Officer

-2-

Paul Rodgers responded and interviewed Hunter and Leffall about the shooting. He testified that Leffall told him that he was dating Graves and that angered Jones. Leffall told the officer where Graves lived. The officer then talked to Graves who said that Jones had admitted to her that he had tried to shoot Leffall. The day after the shooting, Hunter picked out Jones's picture from a photographic array as the person who tried to shoot him. The next day, Leffall also selected Jones's picture from the same photographic array.

## The Graves's Shooting

Graves moved back into her father's house a week or two before her murder. Soon after Graves moved home, Johnson testified that Graves told him that she thought that Jones would kill her and that she was scared of Jones. Graves slept on the living room couch. On March 5, Graves's stepsister, Yolanda Rivers, overheard Jones and Graves talking in the living room while she got something to eat in the kitchen. Jones told Graves that he loved her and that she owed her love to him. Jones also reminded Graves of his gifts to her. Graves then came into the kitchen, and Jones followed her. In the kitchen, Graves told Jones that she was pregnant with Leffall's baby. Jones replied that he would now kill Leffall.

On March 6, Jones spent the afternoon with Graves at her father's house. When Graves went to the restroom, Jones took the clothes from her closet that he had bought for her and left. Later that evening, Graves talked to her aunt, Patsy Henderson, on the phone. Henderson said that Graves put her on hold for five to ten minutes while she answered her

call waiting on the other line. Henderson said that when Graves switched back she was very upset. Graves said that she had been speaking with Jones, and he said that he killed Leffall. Henderson testified that Jones interrupted their telephone conversation again. When Graves switched back to Henderson again, Graves told her that Jones said that if he could not have Graves, then no one else would. Henderson begged Graves to come stay with her because she feared what Jones might do. Henderson testified that Graves called again around midnight to tell her that Jones had called her father and told him that he gave his daughter syphilis. Graves told Henderson that she only talked to Jones because she wanted to tell him that he was a liar. Henderson testified that she told Graves to quit answering the phone because that is how Jones knew that she was at home.

Johnson and Rivers each said that they overheard Graves as she talked on the phone with Jones. Johnson testified that he heard Graves tell Jones that she knew he tried to kill Leffall, and that she was going to tell the police about the shooting and ask a judge for a peace bond to keep him away from her. Rivers testified that Graves also told Jones that he should hurt her and not Leffall because she was the one that ended their relationship. After the conversation on the phone ended, Graves told her father that Jones tried to shoot Leffall. Johnson demanded that Graves not talk to Jones again. That same day Officer Rodgers came to the Johnson house to interview Graves about the Leffall shooting. Officer Rodgers testified that Graves told him that Jones had admitted to her that he had tried to shoot Leffall.

At about 3:00 A.M. on March 7, someone fired gunshots into the Johnson home through the living room windows. The Johnson household ran into the room and found Graves unconscious on the living room floor with six gunshot wounds and called the police and an ambulance. When the police arrived, Graves was able to tell them that "Stevie" had fired the shots. One of Graves's stepsisters told the police that "Stevie" was Stevie Jones. The ambulance took Graves to the hospital, where she later died.

Lawrence Durham, the neighbor who lives two houses down from Johnson, testified that he heard gunshots on the night of Graves's shooting. When Durham turned on his porch light, he saw Jones run from Johnson's house toward his house, get into a car, and leave the scene.

Dallas Police Detective Fred Milligan collected the physical evidence from the shooting scene. He testified that the gunshots came through the living room windows and that he recovered fifteen shell casings from the shooting scene. Detective Milligan said the shots fired into the living room were fired in a downward motion towards the couch on which Graves slept. He also said that the shots were not random, but were localized and aimed toward the couch. Dr. Charles Petty, chief medical examiner for Dallas County who performed Graves's autopsy, testified that Graves was not pregnant and that she died from her gunshot wounds.

## SUFFICIENCY OF THE EVIDENCE

In his first point of error, Jones contends that the evidence is insufficient to support

his conviction. Jones argues that the testimony of the State failed to establish his identity as the murderer.

In determining the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict. *Turner v. State*, 805 S.W.2d 423, 427 (Tex. Crim. App.), *cert. denied*, 112 S.Ct. 202 (1991). We must consider all the evidence, whether properly or improperly admitted. *Thomas v. State*, 753 S.W.2d 688, 695 (Tex. Crim. App. 1988). We determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Turner*, 805 S.W.2d at 427. This standard applies in both direct and circumstantial evidence cases. *Id.* In a circumstantial evidence case, the "reasonable doubt" portion of the test is satisfied if the evidence excludes every reasonable hypothesis except the appellant's guilt. *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex. Crim. App. 1983)(op. on reh'g).[1] Even if evidence presented at trial suggests innocence, the trier of fact can find the defendant guilty. *Castro v. State*, No. 835-90, slip op. at 3 (Tex. Crim. App. January 8, 1992). The trier of fact is charged with the responsibility of resolving factual questions. *Id.* In this process, a trier of fact may reject evidence and testimony that suggests innocence. *Id.* The trier of fact is the sole judge of the witnesses' credibility and can believe all or any part of the testimony. *Williams v. State*, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984).

---

[1] The Court is aware of the Court of Criminal Appeals opinion in *Geesa v. State*, 820 S.W.2d 154, 161 (Tex. Crim. App. 1991), which overrules *Carlsen* and eliminates the "reasonable hypothesis" appellate construct for determining sufficiency. However, *Geesa* expressly applies only to cases tried after the issuance of the opinion. *Geesa*, 820 S.W.2d at 165.

The record shows that:

(1) Graves just before she died identified Jones as the person who shot her;

(2) Jones recently had threatened to kill Graves;

(3) Jones recently had tried to shoot Graves's other boyfriend, Leffall;

(4) Jones was familiar with the layout of the Johnson house;

(5) Jones knew that Graves slept on the living room couch;

(6) Jones knew Graves was at the Johnson house that night;

(7) Physical evidence showed that the shots were fired through the living room window toward the couch where Graves slept; and

(8) After hearing gunshots, the neighbor, Durham, saw Jones run away from the Johnson house.

Viewing this evidence in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that Jones killed Graves. Because the evidence is sufficient to support Jones's conviction, we overrule Jones's first point of error.

## EXTRANEOUS OFFENSE

In his second point of error, Jones contends that the trial court erred in admitting evidence of an extraneous shooting. Jones argues that the Leffall shooting was unrelated to any material issue in the case and its probative value is outweighed by its prejudicial effect. In his seventh and eighth points of error, Jones contends that the suggestive pre-trial identification procedures tainted Hunter's and Leffall's in-court identification of him as the one who shot Leffall on March 6, 1988. He argues that the photographic procedures the

police used produced a substantial likelihood of misidentification that amounts to a denial of his right to due process. At a pretrial hearing on the extraneous Leffall shooting, Jones challenged the admissibility of the extraneous shooting and Hunter's in-court identification of him.

### Admissibility of the Offense

Generally, extraneous offenses are inadmissible. *Williams v. State,* 662 S.W.2d 344, 346 (Tex. Crim. App. 1983). To be admissible, an extraneous offense must be relevant to a material fact issue, and the probative value of the evidence must substantially outweigh the potential for unfair prejudice. *Montgomery v. State,* 810 S.W.2d 372, 388-89(Tex. 1990)(op. on reh'g). To preserve error for an extraneous offense, the defendant must (1) object that the evidence is extraneous under rule 404(b) and (2) lodge an additional objection under rule 403 that the evidence's probative value is substantially outweighed by its prejudicial effect. *Id.* A party that objects on the grounds of an extraneous offense preserves error only on the trial court's relevancy determination. *Id.* Absent a clear abuse of discretion, we will not disturb the trial court's decision on appeal. *Montgomery,* 810 S.W.2d at 390-91.

At the pre-trial extraneous offense hearing, Jones objected to the admissibility of testimony involving the Leffall shooting on the basis that such testimony constitutes an extraneous offense. Jones failed, however, to lodge an additional objection under rule 403 that the evidence's prejudicial effect outweighed it probative value. Because Jones failed

to object properly, he waived his right to complain on appeal about the prejudicial effect of the extraneous offense. Therefore, this Court need only address the relevancy of the shooting. The evidence of Jones trying to kill Leffall the day before Graves's death was relevant to show Jones's motive for killing Graves--extreme jealousy that she was seeing another man. Because the State introduced the offense to show Jones's motive for killing Graves, the trial court did not abuse its discretion in admitting the evidence. We overrule Jones's second point of error.

### Admissibility of In-Court Identification Regarding the Extraneous Offense

Before setting aside a conviction based on an eyewitness identification at trial following a pretrial photographic identification, the court must determine that the photographic display was impermissibly suggestive and gave rise to a substantial likelihood of misidentification. *Turner v. State*, 614 S.W.2d 144, 145-46 (Tex. Crim. App. [Panel Op.] 1981). Absent clear and convincing evidence that the in-court identification is tainted by improper pretrial procedures, the in-court identification is always admissible. *Jackson v. State*, 626 S.W.2d 446, 448 (Tex. Crim. App. [Panel Op.] 1982). When the defendant challenges a complaining witness's in-court identification, this Court must determine the witness's ability to reconstruct an accurate independent image of the criminal wrongdoer, in comparison with the defendant's in-court appearance. *Id.* If the totality of the circumstances reveals no substantial likelihood of misidentification despite the suggestive pretrial photographic identification procedure, then this Court will deem the identification

testimony reliable and therefore admissible. *Madden v. State*, 799 S.W.2d 683, 695 (Tex. Crim. App. 1990), *cert. denied*, 111 S.W.2d S.Ct. 2912 (1991). In assessing the reliability of the in-court identification, we weigh the following nonexclusive factors against the corrupting effect of the suggestive identification procedure:

(1)    The witness's opportunity to view the criminal at the time of the crime.

(2)    The witness's degree of attention.

(3)    The accuracy of the witness's prior description of the criminal.

(4)    The level of certainty demonstrated at the trial confrontation.

(5)    The time in between the confrontation.

*Madden*, 799 S.W.2d at 695.

### Frederick Hunter

Hunter testified about the pre-trial identification procedures at the extraneous evidence hearing, at the trial court's photographic procedure hearing, and before the jury. The record shows that the trial court heard the following testimony:

(1)    Hunter viewed the crime from eight feet away through a glass window for eight seconds;

(2)    Hunter saw the photographic lineup the day after the shooting;

(3)    The photographic lineup contained five photographs of males that were similar to Jones in height, weight, and hair type;

(4)    Because Jones has a condition called sleepy eye, the lineup included photographs of many persons who have this condition;

(5)   The police did not tell Hunter which photograph to pick;

(6)   Hunter chose Jones's photograph; and

(7)   Hunter identified Jones as Leffall's shooter without hesitation at trial and testified that his in-court identification was based from memory.

Hunter had a clear opportunity to observe the shooting, identified Jones from a photographic lineup shown to him one day after the incident, and never identified anyone else as the shooter. Hunter testified he could have identified Jones without the aid of the photographic lineup. Viewing the totality of the circumstances and likelihood of misidentification, we conclude that the photographic display was not impermissibly suggestive, that it did not give rise to a substantial likelihood of misidentification, and that Hunter independently identified Jones as Leffall's shooter. Because the pre-trial identification was not impermissibly suggestive, the trial court did not error in allowing Hunter's in-court identification. We overrule Jones's seventh point of error.

### Jerry Leffall

Leffall testified at the court's photographic procedure hearing and before the jury. The record shows that the trial court heard the following testimony:

(1)   Leffall saw Jones for at least five seconds before Jones started shooting at him;

(2)   Leffall saw the photographic array two days after the shooting;

(3)   Leffall saw the same photographic array as Hunter;

(4)   The police handed the array to Leffall, asked him if he recognized anyone,

-11-

and did nothing to suggest to Leffall that he should pick Jones's photograph;

(5) Leffall testified that the police did not suggest that he pick Jones's photograph;

(6) Leffall chose Jones's photograph and positively identified Jones as the man who shot at him; and

(7) At trial, Leffall identified Jones as the shooter and said he would never forget Jones's face.

Leffall had a clear opportunity to observe his shooter, identified Jones from a photographic lineup shown to him two days after the shooting, and never identified anyone else as his shooter. Leffall knew Jones from a previous encounter. Leffall identified Jones in open court as the person who tried to shoot him. Viewing the totality of the circumstances and likelihood of misidentification, we conclude that the photographic display was not impermissibly suggestive, that it did not give rise to a substantial likelihood of misidentification, and that Leffall independently identified Jones as the shooter. Because the pre-trial identification was not impermissibly suggestive, the trial court did not err in allowing Leffall's in-court identification. We overrule Jones's eighth point of error.

Although Jones contends that the trial court should have granted his motion to exclude evidence of the extraneous offense and the two in-court identifications of him, this Court concludes that the extraneous offense showed Jones's motive to kill Graves--extreme jealousy that she was seeing another man and that the in-court identifications presented no substantial likelihood of misidentification. Therefore, the trial court properly admitted

-12-

evidence of the extraneous offense to allow Hunter's and Leffall's identification of Jones as the perpetrator of the extraneous shooting offense.

## HEARSAY

In his third, fourth, fifth, and sixth points of error, Jones contends that the trial court erred in admitting hearsay testimony that denied him the right of confrontation and cross-examination. The Fourth Amendment of the United States constitution, and article I, section ten of the Texas constitution both guarantee the defendant the right to cross-examine witnesses, insofar as necessary to effectuate this right. *Chambers v. Mississippi*, 410 U.S. 284 (1973); *Pointer v. Texas*, 380 U.S. 400 (1965). This right is not absolute and can be denied when the evidence bears the indicia of reliability to ensure the integrity of the fact finding process. *Dutton v. Evans*, 400 U.S. 74 (1970); *Coulter v. State*, 494 S.W.2d 876 (Tex. Crim. App. 1973).

Courts find the requisite indicia of reliability to be present when the hearsay statement is shown to be an excited utterance. *Sellers v. State*, 588 S.W.2d 915, 918 (Tex. Crim. App. 1979); Although the statements constitute hearsay, an excited utterance is an exception to the hearsay rule. TEX. R. CRIM. EVID. 803(2). An excited utterance is defined as "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by an event or condition." TEX. R. CRIM. EVID. 803(2). To establish this exception to the hearsay rule, one must show:

(1)    an occurrence sufficiently startling to produce a spontaneous and unreflecting

statement;

(2)    the declarant made the statement while influenced by the event; and

(3)    the utterance relates to the circumstances of the startling occurrence.

*Martinez v. State*, 533 S.W.2d 20, 23 (Tex. Crim. App. 1976); *Sellers*, 588 S.W.2d at 918; *Woodward v. State*, 696 S.W.2d 622, 626 (Tex. App.--Dallas 1985, no pet.). The focus of the court is to determine the reliability of the statement in light of the cumulative effect of the three requisites. *Sellers*, 588 S.W.2d at 918.

Rule 803(24) also creates another exception to the hearsay rule. It provides as follows:

> (24) **Statement Against Interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Tex. R. Crim. Evid. 803(24).

Additionally, section 19.06 of the Texas Penal Code specifically allows the admission of all relevant testimony concerning the killing in murder cases. *Purtell v. State*, 761 S.W.2d 360, 370 (Tex. Crim. App. 1988). Section 19.06 provides in part:

> In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as

to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased.

Tex. Penal Code Ann. § 19.06(a) (Vernon Supp. 1992).

Finally, when one party offers part of a conversation, the whole conversation on the same subject may be inquired into by the other party. Tex. R. Crim. Evid. 107. When defense counsel pursues a subject that would ordinarily be outside the realm of proper comment by the prosecutor, the defendant "opens" the door and creates a right of reply for the State. *Parr v. State*, 557 S.W.2d 99, 102 (Tex. Crim. App. 1977); *Austin v. State*, 712 S.W.2d 591, 594 (Tex. App.--Tyler 1986, no pet.).

### W. D. Johnson

In his third point of error, Jones's contends that the trial court erred in allowing Johnson, Graves's father, to testify about what Graves said regarding the Leffall shooting. The State argues that the testimony was properly admitted under the excited utterance exception to the hearsay rule.

The record shows that:

(1)   Johnson sat near Graves while she had a phone conversation with Jones;

(2)   During the phone conversation, Graves appeared upset and excited;

(3)   Johnson heard Graves tell Jones that she was going to report him to the police; and

(4)   Immediately after the phone conversation, Graves told Johnson that Jones had told her that he had shot at Leffall.

From this evidence, we conclude that the State established the necessary requisites to show that Graves's statement to Johnson constituted an excited utterance. Because this excited utterance is an exception to the hearsay rule, the trial court did not err in allowing Johnson's testimony. We overrule Jones's third point of error.

### Yolanda Rivers

In his fourth point of error, Jones contends that the trial court erred in allowing Rivers, Graves's stepsister, to testify about a conversation she heard between Graves and Jones the day before the killing and about a statement she overheard Graves make to Jones while she talked on the phone with him. The State argues that Rivers's testimony concerning Graves's statements to Jones was admissible to show the extent of Graves's and Jones's relationship. The State also argues that River's testimony about Jones's statements to Graves during this same conversation were admissible as declarations against penal interest. The State further argues that Graves's statements to Rivers made after Graves's telephone conversation with Jones were admissible as excited utterances.

At trial, Rivers testified that:

(1)   she heard Jones tell Graves that he loved her, wanted her back, and she owed him her love;

(2)   she heard Graves tell Jones that she was pregnant and that he was not the baby's father;

(3)   in response to this statement by Graves, she heard Jones tell Graves that he would kill Leffall; and

-16-

(4)     while Graves was on the phone with Jones, she overheard Graves tell Jones that he should not hurt Leffall, but that he should hurt her because she terminated their relationship.

Statements (1), (2), and (3) are admissible under section 19.06(a) of the Texas Penal Code. These statements show the state of Jones's and Graves's relationship the day before her death. Other evidence corroborates these statements to show that Graves no longer wanted to date Jones. These statements also help to establish the motive for the killing--Jones's jealousy of Leffall.

Statement (3) is also admissible as a statement against penal interest. TEX. R. CRIM. EVID. 803(24). This statement by Jones subjects him to potential criminal liability and provides a motive for the Graves's killing. A reasonable man in Jones's position would not have made the statement unless he meant it. Other evidence corroborates this statement that Jones intended to kill Leffall.

Statement (4) is admissible as an excited utterance. The record shows that:

(1)     Rivers sat near Graves while she had a phone conversation with Jones;

(2)     During the phone conversation, Graves appeared upset and excited; and

(3)     Rivers heard Graves tell Jones that he should hurt her and not Leffall.

From this evidence, we conclude that the State established the necessary requisites to show that the statement Rivers overheard Graves make to Jones constituted an excited utterance. Because the State showed that Rivers's testimony about statements (1) and (2) was admissible under section 19.06(a), that her testimony about statement (3) was admissible

under section 19.06(a) and as a statement against penal interest, and that her testimony about statement (4) was admissible as an excited utterance, the trial court did not err in allowing Rivers's testimony. We overrule Jones's fourth point of error.

### Patsy Henderson

In his fifth point of error, Jones contends that the trial court erred in allowing Henderson, Graves's aunt, to testify about two statements Graves made to her about the Leffall shooting the day before Graves's death. The State argues that the statements constitute excited utterances.

The record shows that:

(1)   Jones interrupted the telephone conversation between Henderson and Graves;

(2)   When Graves returned to her conversation with Henderson, Graves sounded upset and excited;

(3)   Graves immediately told Henderson that Jones said "[h]e's dead. I killed him, I killed him . . . . Did I kill your boyfriend? Did I kill your married man?"

(4)   Jones interrupted the telephone conversation between Henderson and Graves again;

(5)   Once again when Graves returned to her conversation with Henderson, Graves sounded upset and excited; and

(6)   Graves immediately told Henderson that Jones had told her that if he could not have her, that no one else could have her either.

From this evidence, we conclude that the State established the necessary requisites to show that Graves's statements to Henderson constituted excited utterances. Because the State

-18-

showed Graves's statements were excited utterances, the trial court did not err in allowing Henderson's testimony. We overrule Jones's fifth point of error.

### Officer Paul Rodgers

In his sixth point of error, Jones contends the trial court erred in admitting Officer Paul Rodgers's testimony concerning statements Graves made to the officer the day before her death. The State argues that Jones opened the door to the officer's statement.

Officer Rodgers testified that he investigated Leffall's shooting and that he interviewed Graves in connection with the investigation. After a hearsay objection, he testified that Graves told him that Jones had called her and admitted to shooting at Leffall's car. Prior to this testimony, however, defense counsel had cross-examined Officer Rodgers as follows:

> Q. Officer, did Yolanda Graves say she saw Stevie Jones shoot Jerry Leffall?
>
> A. No, sir.

When the defense counsel questioned Officer Rodgers about his conversation with Graves, he opened the door for the State to introduce the entire conversation to explain that Jones had called Graves and admitted to her that he had tried to kill Leffall. Because the State had a right to fully explain the matter opened up by the defense counsel, the trial court did not err in overruling Jones's objection. We overrule Jones's sixth point of error.

-19-

## ADMISSION OF EXTRANEOUS OFFENSE EVIDENCE AT PUNISHMENT PHASE

In his ninth point of error, Jones contends that the trial court erred in admitting evidence of unproven, extraneous offenses that have not resulted in final convictions. He argues that section 3(a) of article 37.07 of the Texas Code of Criminal Procedure precludes the admission of specific conduct to show his character at the punishment phase of trial.

At the punishment phase, Jones testified that he never sold drugs for himself or Jamaican drug dealers. After both sides closed, the State asked the trial court's permission to reopen the case and allow LaTonya Peoples to testify and rebut Jones's testimony. Peoples testified that Jones sold drugs for a living and that she had visited his drug house where she had seen Jones put marijuana and cocaine in a sink. Jones objected to the State's reopening of the case and generally to People's testimony.

To preserve error for appellate review, one must make a timely and specific objection that sets forth the grounds for the objection. *Cisneros v. State*, 692 S.W.2d 78, 82-83 (Tex. Crim. App. 1985). Although Jones objected to Peoples's testimony at the pre-trial extraneous offense hearing on the grounds that her testimony constituted an extraneous offense, he failed to renew his objection at trial. At trial, he failed to state any grounds for his objection. Because Jones failed to renew his objection or specifically object, he failed to preserve error and presents nothing for this Court to review. We overrule Jones's ninth point of error.

We affirm the trial court's judgment.

_____
ED KINKEADE
JUSTICE

Do Not Publish
Tex. R. App. P. 90
901026F.U05